IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| EDGAR TORRES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 12C8389 |
| | ) | |
| WEXFORD HEALTH SOURCES, INC., | ) | Judge John Z. Lee |
| RICHARD SHUTE, M.D., and | ) | |
| IMHOTEP CARTER, M.D., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Edgar Torres is a prisoner at Stateville Correctional Center, who suffered from an umbilical hernia that became incarcerated. He has sued his treating physicians, Dr. Imhotep Carter and Dr. Richard Shute, for deliberate indifference to his serious medical needs in violation of the Eighth Amendment to the United States Constitution pursuant to 42 U.S.C. § 1983. In addition, Torres has sued Wexford Health Sources, Inc., the corporation that provides medical care to inmates at Stateville, alleging that Wexford has a de facto policy of delaying and denying all non-emergency hernia surgeries, regardless of an inmate's pain. Defendants have moved for summary judgment. For the following reasons, Defendants' motion is granted in part and denied in part.

## Factual Background

The following facts are undisputed, unless otherwise noted. Defendant Wexford Health Sources, Inc. is a private corporation that has contracted with the Illinois Department of Corrections to provide medical services to inmates at Stateville Correctional Center. Defs.' LR56.1(a)(3) Stmt. ¶ 4. Defendant Imhotep Carter is a physician who was employed by Wexford at Stateville. Although he completed his term as Stateville's Medical Director in May

1

2012, *id.* ¶ 2, Dr. Carter was "on call" on June 23, 2012, and advised Nurse Marsha Warning regarding Torres's hernia condition. Defs.' Ex. D, Medical Records, IDOC 001007; Defs.' Ex. E, Warning Dep. at 20. Defendant Richard Shute is a physician who was employed by Wexford as a traveling physician and provided medical services to inmates Stateville from 2007 to 2012. *Id.* ¶ 3.

Torres was an inmate at Tamms Correctional Center (Tamms) from September 2006 through mid-February 2012. *See* Defs.' Ex. A, Torres Dep. at 25; Medical Records, Stateville Intake Questionnaire, IDOC 000985. As he describes it, starting in 2006, he had a bubble protruding from his stomach that would occasionally blow up and tear his skin, leaking a sticky liquid. *See* Defs.' Ex. A, Torres Dep. at 24–25. He experienced shooting pain in that area and would have to buckle over or sit down for ten minutes at a time. *Id.* at 26. When he sought medical treatment, a physician at Tamms told him that he was suffering from an umbilical hernia and informed him that, as long as it could be pushed back in, he would be okay. *Id.* at 24. An umbilical hernia occurs when abdominal contents protrude through an opening in the abdominal wall and/or abdominal muscles. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 1. Umbilical hernias come in various forms. For example, it can be "reducible," meaning that the hernia can easily be pushed back or reduced into the abdominal cavity with manual manipulation. Defs.' LR 56.1(a)(3) Stmt. ¶ 49. An umbilical hernia also can be "irreducible." To some physicians, a hernia is irreducible if it cannot be reduced under any condition; other physicians use the term "irreducible hernia" to refer to a hernia that can only be reduced with significant manipulation when the patient is under sedation. Defs.' Ex. F, Natesh Dep. at 15. Another term for an umbilical hernia that cannot be reduced under any circumstances is an "incarcerated" hernia. *See* Defs.' LR 56.1(a)(3) Stmt. ¶ 51.

An individual with an incarcerated hernia experiences increased pain. *Id.* The abdominal lining (the peritoneum) is extremely sensitive, and when it is stretched and pulled by the protruding abdominal contents, the individual feels quite a bit of pain. Defs.' Ex. F, Natesh Dep. at 11. Pain from an incarcerated hernia may be treated temporarily with medication, but medication does not cure the problem. Defs.' LR 56.1(a)(3) Stmt. ¶ 51; Defs.' Ex. F, Natesh Dep. at 19.

The only treatment for an incarcerated hernia is surgery, which should be performed as soon as possible, preferably within twenty-four hours and no later than a week after diagnosis. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 40. If an incarcerated hernia is left untreated, it can become "strangulated." Defs.' Ex. F, Natesh Dep. at 22. A strangulated hernia is a life-threatening condition in which the abdominal contents contained in the hernia lose blood circulation, causing the tissue to die and become gangrenous. Defs.' LR 56.1(a)(3) Stmt. ¶¶ 52–53; Defs.' Ex. F, Natesh Dep. at 20. Symptoms of a strangulated hernia include vomiting, abdominal distension, and septic shock. *Id.*

Wexford's policy manual regarding the repair of abdominal wall hernias provides that hernias may be classified as reducible, incarcerated, or strangulated. Pl.'s Ex. 1, Wexford Health Medical Policies and Procedures, at GS-3. Furthermore, the manual states that "based upon the current medical literature regarding the natural history of abdominal hernias, their repair and recurrence, it is Wexford Health's position that . . . [p]atients with incarcerated or strangulated abdominal wall hernias are candidates for herniorrhaphy [hernia surgery] and will be referred urgently for surgical evaluation." Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 13. The manual also instructs that "Wexford's physicians should incorporate the tools in this manual into daily practice." Pl.'s Ex. 1, Wexford Health Medical Policies and Procedures, at 4.

On November 29, and December 13, 2011, Dr. Marvin Powers, the Medical Director at Tamms, examined Torres's hernia. Defs.' Ex. D, Medical Records, IDOC 000906, 000976–77. Dr. Powers remarked that Torres's hernia was one inch in diameter and that it was "reducible, but with difficulty." *Id.* Torres asserts that, on December 13, Dr. Powers told him he would request hernia repair surgery for Torres. Torres Dep. at 31–33. Dr. Powers' notes do not reflect this. Defs.' LR56.1(a)(3) Stmt. ¶¶ 9, 33. The record does indicate, however, that on December 13, 2011, Torres's medical records were requested and delivered, but it is unclear by whom and to whom. Defs.' Ex. D, Medical Records, IDOC 000978.

Torres was transferred to Stateville Correctional Center on February 21, 2012. Defs.' LR56.1(a)(3) Stmt. ¶ 10. According to Torres, four days after his transfer, or on February 25, 2012, he filed a medical request (a copy of which he saved), stating that he had been approved for hernia surgery while at Tamms and was currently in pain due to his hernia. Torres Dep. at 47. The record is silent as to whether Defendants made any effort to ask Dr. Powers about this.

On March 6, 2012, Torres complained of hernia pain and requested to go to the medical unit. Defs.' Ex. D, Medical Records, IDOC 000987. On March 9, 2012, Torres was examined by a physician's assistant, who noted that Torres had reported that his hernia was very painful and getting bigger. *Id.* at 988. The physician's assistant referred Torres to Stateville's Medical Director, Dr. Carter. *Id.*

Dr. Carter examined Torres's hernia on April 9, 2012,. Defs.' LR 56.1(a)(3) Stmt. ¶ 11. Dr. Carter diagnosed Torres as having a "non-reducible" hernia that he described as "permanent." Defs.' Ex. D, Medical Records, IDOC 000989. During his deposition, Dr. Carter testified that he considers a hernia to be "incarcerated," if its abdominal contents cannot be easily returned to the abdominal cavity. Defs.' Ex. B, Carter Dep. at 47. But, according to him, to

4

determine whether a hernia is, in fact, incarcerated "[t]here would have to be some kind of a test performed in order to identify . . . the contents of the hernia" to determine whether the hernia contained abdominal materials, rather than simply air. Defs.' Ex. B, Carter Dep. at 47. Dr. Carter intimates that the required test could not be performed at the Stateville facility. *Id.*; *id.* at 50. He avers that he does not "have any way to determine the risk of incarceration of a non-reducible hernia. That's not my skill set." *Id.* at 55.

After examining Torres, Dr. Carter recommended that Torres's hernia condition undergo what is known as "collegial review" to determine whether Torres should be referred for a surgical evaluation appointment with a physician in the general surgery department at University of Illinois Hospital in Chicago (UIC). *Id.* A collegial review is a weekly teleconference meeting between on-site and off-site Wexford personnel, including the Stateville's Medical Director, to discuss both urgent and non-urgent services. The review participants determine the most appropriate approach to the health care issue. Pl.'s Ex. 2, Wexford Medical Program, § XI.B.12. That said, Dr. Carter, as the Medical Director, had the ability to conduct an immediate collegial review in urgent cases. *Id.* § XI.B.4. Dr. Carter also had the authority to send inmates to the hospital in emergency situations. *See, e.g.*, Defs.' Ex. D, Medical Records, IDOC 001007. On the form requesting collegial review for Torres's condition, Dr. Carter checked a box indicating that the matter was "not urgent." Defs.' LR56.1(a)(3) Stmt. ¶ 16.

Although the parties agree that Torres's hernia caused him pain, they disagree as to its constancy and severity. Torres testified that, at the time that Dr. Carter examined him, he was in constant pain. Defs.' Ex. A, Torres Dep. at 91.[1] According to Torres, the severity of the pain

---

[1] Although Defendants assert that Torres did not complain of any hernia pain on April 9, they cite to a portion of an exhibit that was not provided to the Court. *Compare* Defs.' Resp. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 17 (citing Defs.' Ex. D, 79:23–80:6), *with* Defs.' Ex. D. Accordingly, the Court does not consider Defendant's assertion.

5

varied from being bearable, where he was able to walk, *id.* 89–90, to unbearable, where the stabbing, shooting pain lasted for hours and Torres was unable to stand or get out of bed, *id*. 86, 87, 89–91.

Dr. Carter prescribed an over-the counter, nonsteroidal anti-inflammatory drug, Naprosyn, for Torres's pain. Defs.' Ex. D, Medical Records, IDOC 000989. But Naprosyn did not alleviate Torres's hernia pain. *Id.* ¶ 85. And on April 16 and May 6, 2012, Torres wrote letters to Salvador Godinez, who was then Director of the Illinois Department of Corrections, stating that the pain was too much for him to bear. Defs.' Ex. A, Torres Dep. at 157–58.

On April 16, April 23, and April 30, 2012, Dr. Carter participated in collegial reviews during which the participants discussed urgent and non-urgent surgical evaluation referrals for Stateville inmates. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 20. Despite the fact that he had recommended a review of Torres's case on April 9, 2012, Dr. Carter did not discuss Torres' hernia at any of these meetings. *Id.*

On May 7, 2012, Dr. Carter participated in yet another collegial review, and this time, the participants approved Torres's referral for an outside surgical evaluation to determine whether he would be a candidate for surgical hernia repair. Defs.' LR 56.1(a)(3) Stmt. ¶ 15. Wexford's records reflect that, on day of the collegial review, a Wexford employee contacted UIC regarding Torres's surgical evaluation and noted "appointment two months." Defs.' Ex. B, Carter Dep. at 94–95. Dr. Carter's last day as Medical Director at Stateville was May 12–13, 2012.

Two weeks later, Torres again complained of hernia pain, and Dr. Shute examined Torres on May 22, 2012. Defs.' Ex. D, Medical Records, IDOC 000995. Dr. Shute described the hernia as "semi-hard," "fleshy," "mushroom-shaped," and measuring five centimeters, or almost two inches. *Id.* IDOC 000995. The hernia had doubled in size in seven months. *Compare id.*,

IDOC 000995, *with id.*, IDOC 000977. And Dr. Shute commented that Torres's hernia "[d]oesn't reduce at all." *Id.*, IDOC 000995.

A week later, on May 30, 2012, Dr. Shute examined Torres, because he again was complaining of severe hernia pain. *Id.*, IDOC 000996. Dr. Shute noted that the examination was unchanged from Torres's previous visit, but he changed Torres' pain medication to Tramadol, which is a narcotic. *Id.*

Five days later, on June 4, 2012, Torres complained that, even with the Tramadol, his hernia had become even more painful (a "7" on a scale of 1 to 10), his navel had a very tight feeling, and the hernia had been discharging liquid and felt like it was "about to burst." *Id.*, IDOC 000997. Again, Dr. Shute noted that the treatment plan remained unchanged from May 22, 2012, and the surgical evaluation at UIC was "in planning." *Id.*, IDOC 000999.

Two weeks later, on June 23, 2012, Torres told Nurse Marsha Warning that he had been in constant, severe pain for five days and that the pain had not been controlled by Tramadol. *Id.*, IDOC 001007. Nurse Warning noted that Torres' hernia showed discoloration, which could indicate strangulation. Defs.' Ex. E, Waring Dep. at 28–29; Defs.' Ex. F, Natesh Dep. at 52 (stating discoloration indicates loss of blood supply). Waring called Dr. Carter, who happened to be the doctor on call that day, and he told her to send Torres to the emergency room at St. Joseph's Hospital in a state vehicle, which she did. *Id.* at 20; Defs.' Ex. D, Medical Records, IDOC 001007.

After Torres arrived at St. Joseph's emergency room, Dr. R.K. Natesh, a doctor there, made "an obvious diagnosis of incarcerated umbilical hernia." Defs.' Ex. F, Natesh Dep. at 36, 48. According to Dr. Natesh, an indication that a hernia is incarcerated is when the fat tissue or the intestine comes through a small defect in the abdominal wall in the shape of a mushroom

7

with a narrow stalk that cannot be pushed back in. *Id.* at 17. In the view of Dr. Natesh, who performs hundreds of hernia surgeries annually, if a patient has an incarcerated hernia but is not vomiting, nauseous, or in a great deal of pain, the hernia can be repaired within a few days. *Id.* at 10, 45. However, if the patient with an incarcerated hernia is in a lot of pain, the surgery should be performed within twenty-four hours. *Id.* at 45.

A CT scan of Torres's hernia, taken at St. Joseph's Hospital, showed that the omentum (a fold in the membrane lining the abdominal cavity) was being strangulated in Torres's hernia and had no blood supply, making the omentum tissue no longer viable. *Id.* at 37–38, 40–41. What is more, Dr. Natesh, who examined Torres after the CT scan was taken, stated that a CT scan had not been necessary because the diagnosis was so obvious: Torres's hernia was clearly incarcerated, and because Torres was in severe pain, surgery was required. *Id.* at 48.[2]

For reasons unknown, the doctors at St. Joseph's Hospital prepared to send him to UIC for hernia surgery. Defs.' Ex. A, Torres Dep. at 117. However, he ultimately remained at St. Joseph's Hospital, and on June 25, 2012, Dr. Natesh surgically repaired Torres's hernia. Pl.'s LR 56.1(b)(3)(B) ¶ 36.

## **Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court gives "the non-moving party the benefit of conflicts in the evidence and reasonable inferences that could be drawn from it." *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 794 (7th Cir. 2013). In order to survive summary judgment, the

---

[2] In addition, Dr. Natesh advised Torres that he might have to remove some of Torres's umbilical skin because it had been stretched so thin for so long that it had lost blood supply, had turned bluish, and had become infected. *Id.* at 38–39, 44.

nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmovant "must establish some genuine issue for trial such that a reasonable jury could return a verdict in her favor." *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir.2012).

## Analysis

Section 1983 provides a private right of action against persons acting under color of state law who violate constitutional rights. 42 U.S.C. § 1983. The Eighth Amendment, applied to the states through the Fourteenth Amendment's Due Process Clause, prohibits cruel and unusual punishment. *Gillis v. Litscher*, 468 F.3d 488, 491 (7th Cir. 2006). Cruel and unusual punishment includes deliberate indifference to the serious medical needs of prisoners. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

I.   **Dr. Carter and Dr. Shute**

"A plaintiff claiming a constitutional violation under § 1983 for denial of medical care must meet both an objective and subjective component." *Pittman ex rel. Hamilton v. Cty. of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014). First, he must show that his medical need is objectively serious. *Id.* "A medical need is considered sufficiently serious if the [plaintiff's] condition has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would perceive the need for a doctor's attention." *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (quotation omitted). Second, "the plaintiff must show that the defendant[s] . . . had a sufficiently culpable state of mind—that their acts or omissions [were] sufficiently harmful to evidence deliberate indifference to his serious medical needs." *Pittman*, 746 F. 3d at 775–76 (quotation omitted).

9

### A. Objectively Serious Medical Condition

The Seventh Circuit has recognized that a hernia can be an objectively serious medical condition. *Gonzalez v. Feinerman*, 663 F.3d 311, 314 (7th Cir. 2011) (citing cases). The Seventh Circuit has also acknowledged that chronic pain, in and of itself, is a separate, objectively serious condition. *Id.* Moreover, the Seventh Circuit has explained that surgery is the standard response for a painful hernia:

> According to the National Institutes of Health, 'surgery will usually be used for hernias that are getting larger or are painful' and is the only treatment that can permanently fix a hernia. See Medline Plus, Hernia, http://www.nlm.nih.gov/medlineplus/ency/article/ 000960.htm (last visited Nov. 29, 2011) . . . . While surgery can be postponed, delay is recommended only for patients with minimal or no symptoms, and then "only if the hernia can be reduced readily and completely and will remain in position despite physical activity." *Kingsnorth*, *supra* at 59.

*Id.* at 315. Because there is evidence in the record that Torres's hernia was permanently irreducible, was increasing in size, and was extremely painful, and that he was referred to UIC for surgical evaluation, a rational jury could find that Torres's hernia rose to the level of an objectively serious medical condition. Defs.' Ex. D, Medical Records, IDOC 000995, IDOC 000977, IDOC 000988, IDOC 000996.

As for the level of Torres's hernia pain, the parties dispute its severity and constancy. Defendants point to physical examination notes, as well as portions of Torres's own deposition, to show that Torres's pain was neither continuous nor severe. Defs.' LR 56.1(a)(3) Stmt. ¶¶ 34, 35, 38. Torres counters that, although the level of pain fluctuated between being bearable and unbearable, the pain was constantly present. Defs.' Ex. A, Torres Dep. 86–91. Moreover, it is undisputed that from at least June 18 to June 23, 2012, Torres's hernia pain was constant, severe, and uncontrolled by narcotic pain medication. Defs.' LR 56.1(a)(3) Stmt. ¶ 34; Defs.' Ex. D,

Medical Records, IDOC 001007. Viewing the disputed facts in Torres's favor, a reasonable jury could conclude that Torres's pain was sufficient to constitute an objectively serious medical condition.[3]

### B. Deliberate Indifference to Medical Condition

Next, the Court has to consider whether there is evidence in the summary judgment record from which a rational jury could find that Drs. Carter and Shute were deliberately indifferent to his objectively serious conditions. Delaying treatment of a non-life threatening— but painful—condition for nonmedical reasons may constitute deliberate indifference. *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010). This is true even if the delay in treating does not exacerbate the injury. *Smith v. Knox Cty. Jail*, 666 F.3d 1037, 1040 (7th Cir. 2012). But whether a prison official was deliberately indifferent depends on his subjective state of mind. *Petties v. Carter*, ___ F.3d ____, No. 14-2674, 2016 WL 4631679, at *3 (7th Cir. Aug. 25, 2016). To be liable, the official must have been "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and must also have actually drawn that inference. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

As an initial matter, the parties disagree as to whether Dr. Powers, the medical director at Tamms, had approved Torres's hernia surgery before Torres was transferred to Stateville and whether Defendants were on notice that Dr. Powers had done so. On one hand, Defendants assert that Dr. Powers's notes from his examination of Torres on December 13, 2011, did not mention a referral for surgery. Defs.' LR 56.1(a)(3) ¶ 33. In addition, the nurse's notes from an

---

[3] In his memorandum in opposition to Defendants' summary judgment motion, Torres requests that the Court grant summary judgment in his favor as to whether his hernia and hernia pain are objectively serious medical conditions. Pl.'s Mem. at 7–9. However, because Torres did not file a motion for summary judgment, granting partial summary judgment against Defendants at this stage would be inappropriate.

examination of Torres when he arrived at Stateville do not contain any indication from Torres that he had been approved for hernia surgery. *Id.* ¶ 35. Although Torres admits the above facts, he nevertheless states that Dr. Powers told him his hernia surgery was approved on December 13, 2011, and the evidence shows that, later that very day, Torres's medical records were requested and sent out. Defs.' Ex. A, Torres Dep. at 33; Defs.' Ex. D, Medical Records, IDOC 000978. In addition, four days after being transferred to Stateville, Torres himself submitted a medical request stating his surgery had been approved and that he was experiencing hernia pain. Defs.' Ex. A, Torres Dep. at 33, 47. Viewing these facts in Torres's favor, a reasonable jury could conclude that his hernia surgery had been approved on December 13, 2011, and that he had notified Defendants of the approval. The record also contains evidence from which a reasonable jury could find that Torres's hernia was permanently irreducible, incarcerated, and mushroom-shaped and that Torres repeatedly reported experiencing severe pain to Defendants..

For their part, , Defendants argue that there is no evidence in the record that they in fact were aware of a substantial risk of serious harm to Torres. But, even where a defendant denies having been aware of a substantial risk of serious harm, summary judgment is inappropriate when a reasonable jury could conclude from other evidence that this was not so. *See generally Petties*, 2016 WL 4631679, at *1 (reversing district court's grant of summary judgment to defendant doctors who denied knowing that failure to immobilize plaintiff's ruptured Achilles tendon exacerbated the injury). The decision to persist in a course of treatment known to be ineffective—when reasonable alternatives are available—constitutes deliberate indifference. *Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005); *Garvin v Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001). "[W]here evidence exists that the defendants knew better than to make the medical decisions that they did, a jury should decide whether or not the defendants were actually ignorant

12

to risk of the harm that they caused." *Petties*, 2016 WL 4631679, at *5. The summary judgment record contains facts from which a reasonable jury could conclude that Drs. Carter and Shute were aware of Torres's objectively serious medical needs.

After Torres was transferred to Stateville on February 21, 2012, he complained of hernia pain on February 25 and March 5, 2012. Defs.' Ex. A, Torres Dep. at 47; Defs.' Ex. D, Medical Records, IDOC 000987. On March 9, 2012, Torres was examined by a physician's assistant because his umbilical hernia had become "very painful" and was "getting bigger." Defs.' Ex. D, Medical Records, IDOC 000988. The physician's assistant then referred Torres to Dr. Carter. *Id.*

Dr. Carter examined Torres on April 9, 2012, and diagnosed Torres's hernia as "permanent" and "non-reducible." Defs.' LR 56.1(a)(3) Stmt. ¶ 11. He prescribed an over-the-counter medication for Torres's pain. Defs.' Ex. D, Medical Records, IDOC 000989. Although Dr. Carter testified at his deposition that Torres did not exhibit severe pain, his notes from the examination contain no corroboration of this statement. *Compare* Defs.' Ex. B, Carter Dep. at 62, *with* Defs.' Ex. D, Medical Records, IDOC 000989. On the other hand, Torres recounts that, at that time, he was in constant pain, although the degree of pain fluctuated. Defs.' Ex. A, Torres Dep. at 86–87, 89–91. From these facts, a rational jury could conclude that Dr. Carter was aware that Torres had an incarcerated hernia and was feeling significant pain when he first examined him.

Likewise, a jury could reasonably conclude that Dr. Shute was aware that Torres suffered from a painful, incarcerated hernia based on Torres's medical file that included Dr. Carter's diagnosis of a permanent, irreducible hernia, Torres repeated reports of uncontrolled pain, and his own examination of Torres. **O**n May 22, 2012, Torres complained of hernia pain and was

seen by Dr. Shute. Defs.' Ex. D, Medical Records, IDOC 000995. Dr. Shute remarked that the hernia was "semi-hard," "fleshy," and "mushroom shaped," that it did not "reduce at all," and that Naproxyn was ineffective in relieving his pain. *Id.*, IDOC 000995. From these facts, a reasonable jury could conclude that Dr. Shute was aware that Torres's hernia was incarcerated and that he was experiencing pain that could not even be relieved by narcotic pain medication.[4]

In addition, there are facts to support Plaintiff's contention that Drs. Carter and Shute not only were aware of his objectively serious medical condition, but they knew that the treatment they were providing Torres was inadequate in light of the severity of the condition and accepted professional standards. *See Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015). For example, the record indicates that incarcerated hernias, such as the one inflicting Torres, often require an "urgent" referral to a hospital for surgical repair and Dr. Carter and Dr. Shute had the ability to authorize such referrals. *See, e.g.*, *id.*, IDOC 001007; Defs.' Ex. C, Shute Dep. at 42–43. Furthermore, Wexford's hernia surgery manual states: "Based upon the current medical literature regarding the natural history of abdominal hernias, their repair and recurrence, it is Wexford Health's position that . . . [p]atients with incarcerated . . . abdominal wall hernias are candidates for herniorrhaphy [hernia surgery] and *will be referred urgently for surgical evaluation*." Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 13 (emphasis provided). And Wexford physicians were advised to follow the manual in their daily practice. Pl.'s Ex. 1, Wexford Health Medical Policies and Procedures, at 4 (stating "Wexford's physicians should incorporate the tools in this manual into daily practice"). Indeed, Defendants admit that, for an incarcerated hernia that causes pain, surgery is the only appropriate treatment and it should be performed urgently, preferably within twenty-four hours, but up to a week after diagnosis. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 40. (In

---

[4] Dr. Natesh states that when an abdominal hernia is incarcerated, it resembles a huge mushroom with a narrow stalk that you cannot push back in. Defs.' Ex. F, Natesh Dep. at 17.

medical parlance, "urgent" means within twenty-four hours. Defs.' Ex. F, Natesh Dep. at 45.) Finally, Dr. Natesh also states that the reasonable standard of care is not to wait for a painful incarcerated hernia to become strangulated before performing surgery. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 39; Defs.' Ex. F, Natesh Dep. at 21–22, 28–30.

Thus, a reasonable factfinder could conclude that, by referring Torres's case to the collegial review panel on an non-urgent basis, failing to bring up Torres's case with the panel until four weeks later, and attempting to treat Torres's condition with over-the-counter pain medication, Dr. Carter acted with deliberate indifference. Similarly, a rational jury could conclude that Dr. Shute's failure to refer Torres for urgent hernia surgery on May 22, May 30, as well as June 4, 2012, when his incarcerated hernia was causing severe pain that could not be controlled by narcotic pain medication, constitutes deliberate indifference.

For these reasons, Dr. Carter's and Dr. Shute's motion for summary judgment as to the merits of Torres's Eight Amendment claim is denied.

That said, Dr. Carter and Dr. Shute also argue that they are entitled to qualified immunity as a matter of law. But genuine issues of material fact exist as to their state of mind, and, if the jury finds that they acted with deliberate indifference, their conduct would violate clearly established Eighth Amendment law, see *Farmer*, 511 U.S. at 837. Accordingly, Defendants' request for summary judgment on basis of qualified immunity also is denied.

## II. Wexford Health Sources, Inc.

Wexford can be held liable under § 1983 if the unconstitutional act is caused by: "(1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir.

2009); *see Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 927–28 (7th Cir. 2004) (standard for municipal liability of *Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658 (1978), applies to corporations as well).

Torres alleges that his constitutional rights were violated by Wexford's policy of authorizing incarcerated hernia surgery only when an inmate exhibits symptoms of strangulation, which is a life-threatening condition, but not earlier. *See* Consol. Am. Compl. ¶¶ 116–17, 120–21. First, it is undisputed that this, in fact, was Wexford's policy as encapsulated in Wexford's manual, which states "[i]ncarcerated hernias are at risk for strangulation and require urgent surgical surveillance." Pl.'s Ex. 1, Wexford Health Medical Policies and Procedures, at GS-3. And, as Wexford concedes, this policy requires only surveillance of incarcerated hernias for signs of strangulation, rather than an urgent referral for surgical evaluation. Defs.' LR 56.1(a)(3) Stmt. ¶ 13; *see* Defs.' Resp. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 14. Signs of strangulation include discoloration, vomiting, bowel obstruction, and abdominal distension. *Compare* Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 6, *with* Defs.' Resp. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 6; *see* Defs.' Ex. F, Natesh Dep. at 52 (stating discoloration indicates ischemia or inadequate blood supply). And Dr. Carter and Dr. Shute adhered to this guideline. *See* Defs.' Ex. D, Medical Records, IDOC 000995–IDOC 000996, IDOC 000999 (Dr. Shute not approving surgery and indicating bowel not obstructed because he heard bowel sounds), IDOC 001007 (Dr. Carter approving surgery referral only when hernia showed discoloration); Defs.' Ex. B, Carter Dep. at 41 (stating that surgery would be indicated if the patient were vomiting, displayed a rigid belly, or had a fever).

Second, there is evidence in the record from which a reasonable jury could conclude that, because of this policy, Torres was made to suffer significant pain for a prolonged period, especially from February 21 to June 23, 2012. *See* Defs.' LR 56.1(a)(3) Stmt. ¶ 34; Defs.' Ex. A,

Torres Dep. 86–91; Defs.' Ex. D, Medical Records, IDOC 001007; *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008) (delay in the treatment of painful, but non-life threatening conditions may violate the Eighth Amendment). Accordingly, the Court denies Wexford's motion for summary judgment.

## Conclusion

For the reasons stated herein, the Court denies Defendants' motion for summary judgment [123]. A status hearing will be held on October 5, 2016 at 9:00 a.m.. The parties should be prepared to set deadlines for pretrial filings and a date for the pretrial conference and trial.

**IT IS SO ORDERED.**          **ENTERED    9/26/16**

_____

**John Z. Lee**
**United States District Judge**